**In re Michael Anthony STELLUTI and Joanne Stelluti, Debtors.**

**NAVISTAR FINANCIAL CORPORATION, Plaintiff–Appellee,**

**v.**

**Michael Anthony STELLUTI, Defendant.**

**Joanne Stelluti, Defendant–Appellant.**

No. 1784, Docket 96–5005.

United States Court of Appeals, Second Circuit.

Argued June 25, 1996.

Decided Aug. 28, 1996.

John S. Willems, New York City (Andrew P. DeNatale, J. Christopher Shore, White &

Case, New York City, of counsel), for Plaintiff–Appellee.

Leonard I. Spielberg, Harold, Salant, Strassfield & Spielberg, White Plains, NY, for Defendant–Appellant.

Before: MINER, JACOBS and PARKER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Joanne Stelluti ("Ms. Stelluti") appeals from a judgment entered in the United States District Court for the Southern District of New York (Parker, J.) affirming an order of the United States Bankruptcy Court. The bankruptcy court found that $480,000 of Ms. Stelluti's debt to plaintiff-appellee Navistar Financial Corporation ("Navistar Financial") was nondischargeable under 11 U.S.C. § 523(a)(6) because her actions in helping her husband, Michael Anthony Stelluti ("Mr. Stelluti"), transfer funds that were the property of Navistar Financial to out-of-state bank accounts were willful and malicious. For the reasons that follow, we affirm the judgment of the district court.

## BACKGROUND

Navistar Financial is a Delaware corporation engaged in the business of financing the acquisition of motor vehicles. At the time of the events in this case, Mr. Stelluti was the president and sole shareholder of Crossroads Truck Center, Inc. ("Crossroads"), a New Jersey corporation. At the same time, Ms. Stelluti was employed by Crossroads to perform bookkeeping and clerical tasks, such as making bank deposits and answering the telephones. She was neither an officer nor a shareholder of Crossroads.

In November of 1987, Crossroads and Navistar Financial entered into a Dealer Sales/Maintenance Agreement (the "Dealership Agreement"), under which Crossroads agreed to purchase motor vehicles manufactured by Navistar International Corp. and to finance the purchase of these motor vehicles through Navistar Financial. The Dealership Agreement provided that the proceeds of the sales of the vehicles,

whether in cash, property or an obligation of the customer to the extent owed to Navistar [Financial], shall be considered the property of Navistar [Financial] in lieu of the goods so sold. Cash proceeds of such resale shall be immediately forwarded to Navistar [Financial] and all other proceeds will be held separately in trust for Navistar [Financial] and subject to its order.

Mr. Stelluti and Ms. Stelluti each executed a personal guaranty by which they guaranteed Crossroads' debts to Navistar Financial.

Between June of 1991 and August of 1991, Crossroads financed the purchase of 24 Navistar International vehicles through Navistar Financial pursuant to the Dealership Agreement. Crossroads, in turn, sold the vehicles to its customers and received the total sum of $621,083.10. The proceeds from the sales of the vehicles (the "proceeds") were deposited in Crossroads' general operating account (the "Crossroads Operating Account") at Somerset Trust Company in Somerville, New Jersey.

While the proceeds were in the Crossroads Operating Account, Crossroads became involved in a dispute with Navistar Financial. Mr. Stelluti subsequently learned from another dealer that Navistar Financial was "after [Mr. Stelluti]" and that Navistar Financial was getting ready to "pull the plug" on Crossroads. Mr. Stelluti stated in an affidavit: "When we learned from representatives of Navistar [Financial] that Navistar [Financial] was getting ready to 'pull the plug' on Crossroads and tighten up on credit, we took steps that we considered to be prudent in the interest of Crossroads." Mr. Stelluti stated that he wanted to "give Crossroads some leverage in its negotiations that were pending with Navistar [Financial] and might as a result save Crossroads from bankruptcy."

Through a series of transactions, the Stellutis withdrew all $621,083.10 of the proceeds of sales from the Crossroads Operating Account. On August 8, 1991, Mr. Stelluti wrote a check to himself in the amount of $200,000 from the Crossroads Operating Account and deposited the check into the Stellutis' joint personal account at Chemical Bank in Bridgewater, New Jersey. Mr. Stelluti told

his wife about this transfer of funds. On August 12, 1991, Mr. Stelluti withdrew an additional $280,000 from the Crossroads Operating Account and purchased a Somerset Trust bank check payable to Crossroads in that amount.[1]

On August 12th, Ms. Stelluti withdrew $200,000 from the Stellutis' personal account at Chemical Bank and obtained a bank check payable to her husband in that amount. On that same day, the Stellutis drove approximately 60 miles from Bridgewater to Greenwich, Connecticut. In Greenwich, Ms. Stelluti opened a new joint personal account in the Stellutis' name at Putnam Trust Co., and she deposited the $200,000 Chemical Bank check in the account. Ms. Stelluti also deposited the $280,000 Somerset Trust bank check in a newly-opened money market account in Crossroads' name at Putnam Trust. Thereafter, Ms. Stelluti opened a new checking account in Crossroads' name at Putnam Trust, and she transferred $250,000 from the Crossroads money market account into the new Crossroads checking account. Ms. Stelluti also transferred $20,000 from the Stellutis' personal account at Putnam Trust into the Crossroads checking account.

Ms. Stelluti testified that she had believed that the funds that she and her husband withdrew from the Crossroads Operating Account were the property of Crossroads. However, she acknowledged that their actions in transferring the funds from accounts in New Jersey to accounts in Connecticut did seem "a little strange." Ms. Stelluti claimed, however, that when she asked her husband during the trip why they were travelling so far to open new bank accounts, he "got very angry and just said … everything will be alright and this is what he wanted to do." Ms. Stelluti stated that she "really didn't understand why he was doing it," but that she "just went along with it."

On August 16, 1991, Mr. Stelluti paid $262,341.26 from the Crossroads checking account to the Federal Deposit Insurance Corporation to satisfy a loan that the Stellutis

personally had guaranteed. In addition, Mr. Stelluti paid $50,000 from the Stellutis' personal account at Putnam Trust on a mortgage on the Stellutis' personal residence, and he transferred about $40,000 to another of his companies, Crossroads Leasing Co. Ms. Stelluti withdrew approximately $58,000 from the Stellutis' personal account to purchase trailers for Crossroads Leasing Co.

Navistar Financial never received any of the $621,083.10 in proceeds that Crossroads had obtained from the sales of the 24 vehicles between June and August of 1991. On October 21, 1991, Navistar Financial commenced an action in the United States District Court for the District of New Jersey (the "New Jersey Action") against the Stellutis and Crossroads to recover the proceeds. On April 30, 1993, three days before a hearing on Navistar Financial's motion for summary judgment in the New Jersey Action, the Stellutis filed Chapter 7 petitions in the United States Bankruptcy Court for the Southern District of New York, thereby automatically staying the determination of Navistar Financial's motion. On July 20, 1993, Navistar Financial moved in the bankruptcy court, pursuant to 11 U.S.C. § 362(d)(1), to lift the automatic stay, and the court granted the motion. Thereafter, by order dated October 20, 1993, the district court granted summary judgment in favor of Navistar Financial in the New Jersey Action. The district court entered judgment against the Stellutis, holding them jointly and severally liable to Navistar Financial in the amount of $621,083.10 plus interest, costs, and attorney's fees.

Meanwhile, on July 20, 1993, Navistar Financial had commenced an adversary proceeding in the bankruptcy court against the Stellutis. Navistar Financial sought a determination that, pursuant to 11 U.S.C. §§ 523 and 727, the Stellutis' debts owed to Navistar Financial were nondischargeable. In November of 1993, Navistar Financial moved for summary judgment. On February 3, 1994, the bankruptcy court granted summary judgment in favor of Navistar Financial as to

---

1. The remaining portion of the proceeds in the Crossroads Operating Account, consisting of approximately $141,000, was withdrawn by the Stellutis in other transactions. To the extent that

Ms. Stelluti was liable for this amount, her debt was held to be dischargeable and this portion of her indebtedness is not at issue on this appeal.

its claims against Mr. Stelluti, the court having found that his debt to Navistar Financial was nondischargeable under 11 U.S.C. §§ 523(a)(4) and 523(a)(6). *In re Stelluti,* 163 B.R. 699 (Bankr.S.D.N.Y.1994). However, the bankruptcy court denied Navistar Financial's motion for summary judgment against Ms. Stelluti, the court having found that disputed issues of material fact existed as to whether she "did anything willfully, intentionally or maliciously to harm Navistar [Financial]." *Id.* at 703.

On April 14, 1994, the bankruptcy court held a bench trial on the dischargeability of Ms. Stelluti's debt to Navistar Financial. At the close of the trial, the bankruptcy court made a preliminary finding that Ms. Stelluti "didn't know that the money in the Crossroads [Operating] account was property of Navistar [Financial]." On May 17, 1994, the bankruptcy court determined that $480,000 of Ms. Stelluti's debt to Navistar Financial was nondischargeable under § 523(a)(6). *In re Stelluti,* 167 B.R. 29 (Bankr.S.D.N.Y. 1994). The court found that Ms. Stelluti "acted deliberately and intentionally when she diverted [$480,000 of] the sales proceeds from New Jersey to Connecticut." *Id.* at 34. In addition, the bankruptcy court determined that, "although [Ms. Stelluti] did not know that Crossroads held the sales proceeds in trust for Navistar [Financial], and believed that they represented Crossroads' funds, she nevertheless acted maliciously." *Id.* The court stated that Ms. Stelluti "knew or should have known that diverting the money ... from New Jersey to Connecticut, lacked any personal or business justification and impaired Navistar Financial's ability to recover the money." *Id.* Accordingly, the bankruptcy court determined that Navistar Financial's claim against Ms. Stelluti in the amount of $480,000 was nondischargeable under § 523(a)(6) as a debt resulting from a willful and malicious injury. On appeal, the district court affirmed the order of the bankruptcy court. Judgment was entered on December 20, 1995. This appeal followed.

## DISCUSSION

It is well settled that "[a]n order of a district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review." *In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 (2d Cir.1994). "Thus, we independently review the factual determinations and legal conclusions of the bankruptcy court. The bankruptcy court's legal conclusions are evaluated *de novo;* its findings of fact are subject to a clearly erroneous standard." *Id.* (quotation and citation omitted).

Ms. Stelluti contends that the bankruptcy court erred in finding that her debt to Navistar Financial in the amount of $480,000 was nondischargeable under § 523(a)(6). Specifically, she argues that, given the bankruptcy court's finding that she believed that the funds in the Crossroads Operating Account belonged to Crossroads, the bankruptcy court erred in finding that her actions in transferring the funds to out-of-state bank accounts resulted in willful and malicious injury to Navistar Financial within the meaning of § 523(a)(6). We disagree.

Section 523(a)(6) provides that debts resulting from a "willful and malicious injury by the debtor to another entity or to the property of another entity" are nondischargeable. The term "willful" in this context means "deliberate or intentional." S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5865; H.R.Rep. No. 595, 95th Cong., 2d Sess. 365 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6320; *see also In re Stanley,* 66 F.3d 664, 667 (4th Cir.1995) ("[W]illful means deliberate or intentional." (quotations omitted)); *Vulcan Coals, Inc. v. Howard,* 946 F.2d 1226, 1228 (6th Cir.1991) (same).

The term "malicious" means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will. *See* 3 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 523.16[1], at 523–110 (15th ed. 1996); *see also In re Garner,* 56 F.3d 677, 681 (5th Cir.1995) ("Willful means intentional and malicious adds the absence of just cause or excuse." (quotation omitted)); *In re Walker,* 48 F.3d 1161, 1164 (11th Cir. 1995) ("As used in section 523(a)(6), malicious means wrongful and without just cause or excessive even in the absence of personal

hatred, spite or ill-will." (quotations omitted)); *Vulcan Coals,* 946 F.2d at 1229 (same). Malice may be constructive or implied. *In re Walker,* 48 F.3d at 1164; *see also In re Stanley,* 66 F.3d at 668. Implied malice may be demonstrated "by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *In re Stanley,* 66 F.3d at 668 (quotation omitted and alteration in original); *see also In re Ikner,* 883 F.2d 986, 991 (11th Cir.1989) ("Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice.").

In the present case, the course of conduct undertaken by Ms. Stelluti in transferring $480,000 of the proceeds to out-of-state bank accounts was deliberate and intentional. Although she was not aware that the funds belonged to Navistar Financial, she was aware of the debt to Navistar Financial. Ms. Stelluti testified that, when she executed the personal guarantee, she had understood that she was guaranteeing debts of Crossroads to Navistar Financial. Ms. Stelluti also testified that she was aware in August of 1991 that her husband was having a dispute with Navistar Financial, and that he had become "very upset" and had decided to withdraw the funds from the Crossroads Operating Account in order to "secure [the Stellutis'] interest." Mr. Stelluti stated, "When *we* learned from representatives of Navistar [Financial] that Navistar [Financial] was getting ready to 'pull the plug' on Crossroads and tighten up on credit, *we* took steps that *we* considered to be prudent in the interest of Crossroads." (Emphasis added.) Ms. Stelluti proceeded to take a number of affirmative steps that necessarily produced harm to Navistar Financial as she transferred the funds from accounts in New Jersey to accounts in Connecticut. Not only did she herself withdraw $200,000 of the proceeds from the Stellutis' personal account in Bridgewater, but she also deposited a total of $480,000 in new bank accounts in Greenwich. Accordingly, the bankruptcy court properly found that Ms. Stelluti's actions were willful.

We also think that Ms. Stelluti's conduct was malicious within the meaning of § 523(a)(6). The bankruptcy court found that, even though Ms. Stelluti believed that the proceeds did not belong to Navistar Financial, her actions in transferring the funds constituted malicious conduct that injured Navistar Financial. Although Ms. Stelluti believed at the time that the proceeds in the Crossroads Operating Account were the property of Crossroads, we think that the circumstances under which she transferred the funds to the out-of-state bank accounts show that her conduct was malicious. When Ms. Stelluti drove with her husband approximately 60 miles to Connecticut to transfer the funds to new accounts, there was no other purpose for their conduct except to harm the interests of Navistar Financial. Ms. Stelluti does not indicate that there were any legitimate personal or business justifications for their actions. In fact, their only connection to Greenwich, Connecticut, the location of the new bank accounts, was that a grandchild lived there. Under these circumstances, we think that it can be implied from Ms. Stelluti's actions in transferring the funds that her conduct was malicious.

Accordingly, Ms. Stelluti's conduct in transferring $480,000 of the proceeds to new accounts in Connecticut was willful and malicious within the meaning of § 523(a)(6). Her actions in diverting these funds injured Navistar Financial, since Navistar Financial was hindered from receiving any of these funds, which subsequently were used by the Stellutis for their own benefit. Thus, the district court properly affirmed the order of the bankruptcy court that found that Ms. Stelluti's debt to Navistar Financial in the amount of $480,000 was nondischargeable under § 523(a)(6).

## CONCLUSION

In view of the foregoing, we affirm the judgment of the district court.